UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------x

101 MCMURRAY, LLC,                          :
                                            :        **OPINION AND ORDER**
                          Plaintiff,        :
                                            :          No. 10-cv-9037 (CS)
             -against-                      :
                                            :
MARTIN PORTER, CRAIG WALLACE,               :
WALLACE & WALLACE, PROOF OF FUNDS,          :
LLC, DANE GEROUS BRIGADIER, and             :
ROBERT EDWARD MAYES, III,                   :
                                            :
                          Defendants.       :
-----------------------------------------------------------------x

Appearances:

Harry H. Wise, III
Law Offices of Harry H. Wise, III
New York, New York
*Counsel for Plaintiff*

Nathaniel B. Smith
New York, New York
*Counsel for Defendant Martin Porter*

Jonathan R. Harwood
Traub Lieberman Straus & Shrewsberry LLP
Hawthorne, New York
*Counsel for Defendants Craig Wallace and Wallace & Wallace*

Susan Sullivan Bisceglia
Sullivan Bisceglia Law Firm, PC
Wappinger Falls, New York
*Counsel for Defendants Proof of Funds, LLC, Dane Gerous Brigadier,*
*and Robert Edward Mayes, III*

Seibel, J.

Before the Court are the motions of Defendants Craig Wallace and Wallace & Wallace (collectively, the "Wallace Defendants"), (Doc. 33), Martin Porter, (Doc. 37), and Proof of Funds ("POF"), Dane Gerous Brigadier, and Robert Edward Mayes, III (collectively, the "POF Defendants"), (Doc. 43). Porter and the POF Defendants seek dismissal of Plaintiff's Second Amended Complaint ("SAC"), (Doc. 29), under Federal Rules of Civil Procedure 12(b)(2) for lack of personal jurisdiction and 12(b)(6) for failure to state a claim. The Wallace Defendants join Plaintiff in opposing the motions to dismiss for lack of jurisdiction, but also move to dismiss two claims against them for failure to state a claim. For the following reasons, Porter's and the POF Defendants' motions are GRANTED IN PART and DENIED IN PART, and the Wallace Defendants' motion is GRANTED.

I.   **BACKGROUND**

The facts (but not the conclusions) in the Amended Complaint are assumed to be true for the purposes of this Opinion. Plaintiff is a limited liability company organized under the laws of Nevada with its principal place of business in California. (SAC ¶ 1.) Porter, a citizen of Florida, Brigadier, a citizen of Ohio, and Mayes, a citizen of Tennessee, each informed Plaintiff that, as principals of POF, a limited liability company organized under the laws of and having a principal place of business in Pennsylvania, they could obtain a $16 million standby letter of credit (the "SLC") for Plaintiff from UBS AG Zurich ("UBS"). (*Id.* ¶¶ 2, 5–7, 11.) At all relevant times, Brigadier, Mayes, and Porter each represented that he worked for POF as a Managing Member, Chief Financial Officer and a Managing Member, and Director of Finance, respectively. (SAC ¶¶ 12–14.) Each of these Defendants, acting on behalf of POF, made representations to Plaintiff regarding the SLC in various telephone conversations and e-mails, and specifically in a written

document entitled "Agreement for Obtaining a Standby Letter of Credit" that Porter sent by e-mail to Plaintiff on or about December 14, 2007 (the "SLC Agreement"), (SAC Ex. A).  (SAC ¶ 11.)  Prior to entering into the SLC Agreement, Plaintiff also received brochures allegedly prepared by Brigadier, Mayes, and Porter, on behalf of POF, that contained additional representations regarding POF's ability to acquire a standby letter of credit.  (*See* SAC ¶¶ 15–17.)

Porter and the POF Defendants allegedly selected Craig Wallace, a citizen of New York, and his law firm, Wallace & Wallace, a partnership organized under the laws of and having a principal place of business in New York, to act as the Escrow Agent for the transaction.  (SAC ¶ 26.)  Information about the law firm and Wallace's former employment at the Kings County District Attorney's Office was displayed prominently on POF's website under the "Escrow Attorney" link.  (*Id.* ¶ 27; *see* Declaration of Harry H. Wise, III ("Wise Decl."), (Doc. 48), Ex. B.)[1]  Under an escrow agreement, to which Plaintiff, Porter as "Director of Finance," and Wallace & Wallace were signatories (the "Escrow Agreement"), (*see* SAC Ex. A, Annex E), the parties agreed that Plaintiff would wire-transfer $680,000 to the Wallace Defendants' Interest on Lawyer Account ("IOLA"), and that, upon the SLC being "placed on DTC/Euroclear or . . . received by [Plaintiff] and the Escrow Agent along with coordinates and authentication," the Wallace Defendants would disburse $440,000 to Porter and $240,000 to POF as an "arrangement

---

[1]  When deciding a motion to dismiss, ordinarily the court's "review is limited to the facts as asserted within the four corners of the complaint, the documents attached to the complaint as exhibits, and any documents incorporated in the complaint by reference."  *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007); *accord Faulkner v. Beer*, 463 F.3d 130, 134 (2d Cir. 2006).  But the court can also consider documents "integral" to the complaint—that is, documents "either in plaintiff['s] possession or of which plaintiff[] had knowledge and relied on in bringing suit," as well as documents concerning "matters of which judicial notice may be taken."  *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993).  Each of the documents filed as exhibits to the Wise Decl.—screenshots of POF's website, correspondence between Plaintiff and certain of the Defendants, and a letter that Plaintiff's counsel received from UBS concerning the SLC—are documents that Plaintiff quotes in its SAC or relied on in bringing this lawsuit.  Accordingly, I may consider each of these documents to determine the instant motions to dismiss.  *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002).

fee," (*see id.* ¶ 3.2.1; SAC Ex. A, Annex B).  POF was a third party beneficiary under the Escrow

Agreement.  (SAC Ex. A, Annex E ¶ 10.1.)

In reliance on the abovementioned representations, Plaintiff entered into the SLC

Agreement and wire-transferred $680,000 to the Wallace Defendants' IOLA account.  (SAC ¶¶

21, 29.)  Defendants delivered the SLC to Plaintiff, (*id.* ¶ 24; *see* SAC Ex. B), and, in turn, the

Wallace Defendants disbursed the funds to Porter and POF, (*see* SAC ¶ 32).  In the months after

Plaintiff entered into the SLC Agreement, Brigadier and Mayes made additional representations

to Plaintiff regarding steps that were being taken to ensure the availability of the SLC funds.

(*See id.* ¶ 19.)  But a genuine $16 million standby letter of credit was never placed on

DTC/Euroclear or received by Plaintiff or the Wallace Defendants along with coordinates and

authentication.  (*See id.* ¶¶ 30–31.)  Rather—as Plaintiff subsequently learned from employees at

UBS—the SLC it received from Porter was a fake that bore forged UBS signatures.  (*Id.* ¶¶ 20,

24; *see* SAC Ex. B; Wise Decl. Ex. G.)  Upon learning that the SLC was fraudulent, Plaintiff

demanded the return of its $680,000, but Defendants failed to give Plaintiff its money back.

(SAC ¶ 34.)

Plaintiff commenced this action by filing a Complaint on December 3, 2010, (Doc. 1),

and subsequently amended it twice, (Docs. 3, 29).  Plaintiff brings claims against all Defendants

for violation of the Racketeer Influenced & Corrupt Organizations Act ("RICO"), 18 U.S.C. §

1964(c), fraud, conversion, and unjust enrichment, and also asserts claims solely against the

Wallace Defendants for breach of the Escrow Agreement and gross negligence.  Porter and the

POF Defendants now move to dismiss the SAC under Rule 12(b)(2) for lack of personal

jurisdiction, and all Defendants move to dismiss various claims under Rule 12(b)(6).

## II.   **LEGAL STANDARD**

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*  "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitle[ment] to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (alteration in original) (citations and internal quotation marks omitted).  Although Federal Rule of Civil Procedure 8 "marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, . . . it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Iqbal*, 129 S. Ct. at 1950.

In considering whether a complaint states a claim upon which relief can be granted, the Court may "begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth," and then determine whether the remaining well-pleaded factual allegations, accepted as true, "plausibly give rise to an entitlement to relief." *Id.* Deciding whether a complaint states a plausible claim for relief is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id.* (second alteration in original) (quoting Fed. R. Civ. P. 8(a)(2)).

5

III.  **DISCUSSION**

A.  **Personal Jurisdiction**

At the motion to dismiss stage, the plaintiff must only make a *prima facie* showing by its pleadings and affidavits that the court has jurisdiction over each of the defendants.  *See CutCo Indus., Inc. v. Naughton*, 806 F.2d 361, 364–65 (2d Cir. 1986) (at trial, plaintiff must demonstrate personal jurisdiction by preponderance of the evidence).  A federal court sitting in diversity looks to the law of the state in which it sits to ascertain whether it may exercise personal jurisdiction over a foreign defendant.  *See Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120, 124 (2d Cir. 2002).  In such cases, the court must determine if the forum's law would confer jurisdiction through its long-arm statute, and then decide if the exercise of such jurisdiction is permissible under the Due Process Clause of the Fourteenth Amendment.  *Id.*

Plaintiff contends that the Court has jurisdiction over Porter and the POF Defendants (1) under either of two subsections of New York's long-arm statute, N.Y. C.P.L.R. ("CPLR") 302(a)(1) or (a)(2); (2) because Defendants—through Porter as POF's "Director of Finance"— consented to "submit to the exclusive jurisdiction of the Courts of New York" in connection with "any dispute relating to th[e] Escrow Agreement"; or (3) based on the nationwide jurisdiction afforded to plaintiffs under the RICO statute.  (P's Mem. 5–11.)[2]  Porter and the POF Defendants make various arguments regarding why the Court lacks personal jurisdiction over them.  For example, they argue that they neither committed any acts nor were ever present in New York,

_____

[2]  "P's Mem." refers to Plaintiff's Memorandum of Law in Opposition to Defendants' Motions to Dismiss the Second Amended Complaint.  (Doc. 49.)

(*see* Porter's Mem. 7; POF Ds' Mem. 7–8),[3] Plaintiff has failed to show that Porter and the POF Defendants had sufficient control over the Wallace Defendants to deem them their agents under CPLR 302(a)(1), (*see* Porter's Mem. 9–10; Porter's Reply Mem. 2–3; POF Ds' Reply Mem. 3–5),[4] and wiring money into New York State is insufficient, by itself, to confer personal jurisdiction under CPLR 302(a)(1), (*see* Porter's Mem. 8–9; POF Ds' Mem. 10–12).  The POF Defendants also claim that the Wallace Defendants cannot be considered their agents under CPLR 302(a)(1) because they did not choose the Wallace Defendants to handle, collect, or disburse the money, as demonstrated by the fact that they are not parties to the Escrow Agreement.  (*See* POF Ds' Reply Mem. 4–5.)  The Wallace Defendants oppose their co-Defendants' motions to dismiss for lack of personal jurisdiction.  (*See* Wallace Ds' Opp'n Mem.)[5]  They join Plaintiff's arguments that the Court has specific jurisdiction over their co-Defendants, and further argue that the Court has general jurisdiction over them because the Defendants all worked together over a course of approximately twenty transactions, which demonstrates that the other Defendants were engaged in a continuous and systematic course of activity in New York.  (*Id.* 3–5, 7–8.)

I find that jurisdiction exists, at the very least, under CPLR 302(a)(1).  CPLR 302(a)(1) "gives New York personal jurisdiction over a nondomiciliary if two conditions are met:  first, the nondomiciliary must 'transact business' [in person or through an agent] within the state; second,

---

[3]  "Porter's Mem." refers to Porter's Memorandum of Law in Support of Motion to Dismiss.  (Doc. 38.)  "POF Ds' Mem." refers to the Memorandum of Law of Proof of Funds, LLC, Dane Gerous Brigadier and Robert Edward Mayes, III, in Support of Motion to Dismiss Plaintiff's Second Amended Complaint pursuant to Fed. R. Civ. P. 12(b)(2) and Fed. R. Civ. P. 12(b)(6).  (Doc. 57.)

[4]  "Porter's Reply Mem." refers to Porter's Reply Memorandum of Law in Support of Motion to Dismiss.  (Doc. 40).  "POF Ds' Reply Mem." refers to the Reply Memorandum of Law of Co-Defendants Proof of Funds, LLC, Dane Gerous Brigadier and Robert Edward Mayes, III, in Response to Plaintiff's Opposition to and Wallace Defendants' Partial Opposition to Co-Defendants' Motion to Dismiss Plaintiff's Second Amended Complaint.  (Doc. 58.)

[5]  "Wallace Ds' Opp'n Mem." refers to the Memorandum of Law in Support of the Wallace Defendants' Partial Opposition to Co-Defendants' Motion to Dismiss.  (Doc. 41.)

the claim against the nondomiciliary must arise out of that business activity." *CutCo*, 806 F.2d at 365; *see Kreutter v. McFadden Oil Corp.*, 71 N.Y.2d 460, 467 (1988) (Section 302(a)(1) is a "single act statute" pursuant to which "proof of one transaction in New York is sufficient to invoke jurisdiction") (internal quotation marks omitted). "A nondomiciliary 'transacts business' under CPLR 302(a)(1) when he 'purposefully avails [himself] of the privilege of conducting activities within [New York], thus invoking the benefits and protections of its laws." *CutCo*, 806 F.2d at 365 (alterations in original) (quoting *McKee Elec. Co. v. Rauland-Borg Corp.*, 20 N.Y.2d 377, 382 (1967)). Further, a "claim 'arises out of' a defendant's transaction of business in New York when there exists a substantial nexus between the business transacted and the cause of action sued upon." *Agency Rent A Car Sys., Inc. v. Grand Rent A Car Corp.*, 98 F.3d 25, 31 (2d Cir. 1996) (internal quotation marks omitted).

I first consider the question of whether, as Plaintiff claims, Porter and the POF Defendants transacted business in New York through the Wallace Defendants acting as their co-Defendants' agents. (*See* P's Mem. 6–8.) In determining whether an agency relationship exists for the purposes of CPLR 302, courts "have focused on the realities of the relationship in question rather than the formalities of agency law." *CutCo*, 806 F.2d at 366. "Whether a representative of the defendant qualifies as an agent for jurisdictional purposes does not turn on legalistic distinctions between being an agent or independent contractor," and "no showing of a formal relationship between the defendant and the agent is required." *Robert Diaz Assocs. Enters., Inc. v. Elete, Inc.*, No. 03-CV-7758, 2004 WL 1087468, at *5 (S.D.N.Y. May 14, 2004) (internal quotation marks omitted). Rather, for the Wallace Defendants to be considered their co-Defendants' agents under CPLR 302(a)(1), their actions must have been done "for the benefit of, and with the knowledge and consent of" Porter and the POF Defendants, and Porter and the

8

POF Defendants must have exercised at least "some control" over the Wallace Defendants.  *See CutCo*, at 366 (internal quotation marks omitted).  "[A] sufficient amount of control may involve the ability of the principal to influence such acts or decisions by virtue of the parties' respective roles."  *Cavu Releasing, LLC v. Fries*, 419 F. Supp. 2d 388, 392 (S.D.N.Y. 2005) (internal quotation marks omitted).

Plaintiff has plausibly alleged that the Wallace Defendants acted for the benefit of both Porter and the POF Defendants.  Plaintiff alleges that Porter and the POF Defendants specifically selected the New York-based Wallace Defendants to act as the Escrow Agent, and advertised their relationship with these Defendants on POF's website.  (*See* SAC ¶¶ 26–28.)  Pursuant to the Escrow Agreement, the Wallace Defendants were to, and ultimately did, deliver Plaintiff's funds to Porter and the POF Defendants, and then take a share of such disbursements for Escrow Agent fees and expenses.  (*See* SAC ¶¶ 29, 32; SAC Ex. A, Annex E ¶ 3.2; SAC Ex. A, Annex B.)  The Escrow Agreement demonstrates that the Wallace Defendants acted with the knowledge and consent of, at the very least, Porter, who was a signatory to the agreement and plausibly acted on behalf of the POF Defendants.  (*See* SAC Ex. A, Annex E.)  Moreover, the Escrow Agent's fees were paid out of the funds that the Wallace Defendants wired to POF, suggesting a relationship between the parties.  (*See* SAC Ex. A, Annex B.)  I also find a substantial nexus between the transaction of business in New York under the Escrow Agreement—in which the parties agreed to submit to the exclusive jurisdiction of New York courts—and Plaintiff's various claims against the Defendants.  Indeed, without the Wallace Defendants' involvement in the SLC transaction, Defendants may not have been able to obtain Plaintiff's money because, as Plaintiff plausibly alleges, POF added information regarding the Wallace Defendants to its website "to give false comfort to potential victims of their fraud that the contemplated transactions were

9

legitimate, and that funds delivered to defendants to be held in escrow would be protected."
(SAC ¶ 28.)  Although at this stage it is unclear what level of control Porter and the POF
Defendants had over the Wallace Defendants, drawing all reasonable inferences in the light most
favorable to Plaintiff, I find that Plaintiff has plausibly alleged that Porter and the POF
Defendants transacted business through the Wallace Defendants in New York sufficient to confer
personal jurisdiction pursuant to CPLR 302(a)(1).

Next, I must consider whether asserting personal jurisdiction over Porter and the POF
Defendants would comport with due process.  The due process analysis contains two parts:  "the
'minimum contacts' inquiry and the 'reasonableness' inquiry."  *Licci v. Lebanese Canadian
Bank, SAL*, No. 10-CV-1306, 2012 WL 688809, at *5 (2d Cir. Mar. 5, 2012) (quoting *Chloé v.
Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 164 (2d Cir. 2010)); *see Calder v. Jones*, 465
U.S. 783, 788 (1984) (A non-resident defendant must have "certain minimum contacts [with the
forum] . . . such that the maintenance of the suit does not offend traditional notions of fair play
and substantial justice.") (second alteration in original) (internal quotation marks omitted).
"Minimum contacts exist where the defendant 'purposefully availed itself of the privilege of
doing business in the forum state and could 'reasonably anticipate being haled into court there.'"
*Pearson Educ., Inc. v. Shi*, 525 F. Supp. 2d 551, 557 (S.D.N.Y. 2007) (quoting *Burger King
Corp. v. Rudzewicz*, 471 U.S. 462, 474–75 (1985)).  To determine whether asserting jurisdiction
is reasonable under the circumstances—*i.e.*, comports with traditional notions of fair play and
substantial justice—a court considers five factors:

> (1) the burden that the exercise of jurisdiction will impose on the defendant;
> (2) the interests of the forum state in adjudicating the case; (3) the plaintiff's
> interest in obtaining convenient and effective relief; (4) the interstate judicial
> system's interest in obtaining the most efficient resolution of the controversy; and
> (5) the shared interest of the states in furthering substantive social policies.

*Chloé*, 616 F.3d at 164–65 (citing *Asahi Metal Indus. Co. v. Superior Court*, 480 U.S. 102, 113–14 (1987)).

For the reasons already stated, Plaintiff has plausibly alleged that by specifically choosing the New York-based Wallace Defendants as their agents and entering into the Escrow Agreement in which they agreed to submit to the exclusive jurisdiction of New York courts, Porter and the POF Defendants "purposefully avail[ed] [themselves] of the privilege of conducting activities within the forum State," *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980) (internal quotation marks omitted), which satisfies the minimum contacts test.  As for the reasonableness factors, none suggest that it would offend due process for this Court to exercise personal jurisdiction over Porter or the POF Defendants.  The POF Defendants argue that maintenance of this suit in New York violates their due process rights because each of the POF Defendants is a citizen of a different state other than New York, and pursuant to a Finder's Fee Agreement, Plaintiff agreed to submit to jurisdiction of all disputes related to the Finder's Fee Agreement in Tennessee.  (*See* POF Ds' Reply Mem. 8–9.)  But, as far as the Court can tell, the only burden on Porter or the POF Defendants would be the general inconvenience of litigating in New York.  Given that the parties are dispersed across the country, it does not appear that litigating this case in New York would be any more of a hardship than if it had been brought in either Florida or Tennessee—the other jurisdictions that Defendants raise as possible fora—as almost all of the parties would still have to travel to litigate the action in either of those venues.  Further, a New York court has an interest in adjudicating claims involving a New York lawyer and his New York law firm.  The reasonableness factors thus do not preclude the exercise of personal jurisdiction over Porter and the POF Defendants.

11

Because Plaintiff has made a *prima facie* showing that this Court's exercise of personal jurisdiction is appropriate under CPLR 302(a)(1) and consistent with due process requirements, Porter and the POF Defendants' motions under Rule 12(b)(2) are denied.  I note, however, that while Plaintiff's averments of personal jurisdiction are sufficient at this stage, it must ultimately prove personal jurisdiction by a preponderance of the evidence should the case proceed to trial. *See CutCo*, 806 F.2d at 366.  Should the evidence as developed in discovery show, for example, that the POF Defendants had nothing to do with the selection, advertisement, or use of the Wallace Defendants as Escrow Agent, a summary judgment motion could be made.

**B.**   **RICO**

The civil RICO statute makes it unlawful for "any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . ."  18 U.S.C. § 1962(c).  Each of the Defendants argues—and the Court agrees—that Plaintiff's Section 1962(c) RICO claim fails as a matter of law because Plaintiff neither alleges an enterprise nor a pattern of racketeering activity.  (*See* Porter's Mem. 11–12; Porter's Reply Mem. 4; POF Ds' Mem. 14–19; POF Ds' Reply Mem. 9–10; Wallace Ds' Mem. 7–11; Wallace Ds' Reply Mem. 3–5.)[6]

**i.**   **Enterprise**

A RICO "enterprise" is defined to include "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."  18 U.S.C. § 1961(4).  Where a complaint alleges an association-in-

---

[6]  "Wallace Ds' Mem." refers to the Memorandum of Law in Support of the Wallace Defendants' Motion to Dismiss the Second Amended Complaint.  (Doc. 35.)  "Wallace Ds' Reply Mem." refers to the Reply Memorandum of Law in Further Support of the Wallace Defendants' Motion to Dismiss.  (Doc. 36.)

fact enterprise, courts in this Circuit look to the "hierarchy, organization, and activities" of the association to determine whether "its members functioned as a unit." *First Capital Asset Mgmt. v. Satinwood, Inc.*, 385 F.3d 159, 174–75 (2d Cir. 2004) (internal quotation marks omitted); *see United States v. Turkette*, 452 U.S. 576, 583 (1981) (enterprise "is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit. . . . The 'enterprise' is not the 'pattern of racketeering activity'; it is an entity separate and apart from the pattern of activity in which it engages.  The existence of an enterprise at all times remains a separate element which must be proved . . . .")

Here, Plaintiff has not pleaded specific factual allegations to satisfy the substantive element that Defendants were involved in an "enterprise."  Rather, Plaintiff's SAC contains mere legal conclusions, such as

> Defendants are an association-in-fact "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that engaged in, and the activities of which affected, interstate commerce. They have been associated through time, joined in purpose, and organized in a manner amenable to hierarchical and consensual decision-making with each member fulfilling a specific and necessary role to carry out and facilitate its purpose, which was, upon information and belief, earning money fraudulently by delivering fake bank documents to its victims.

 (SAC ¶ 48).  The only allegations that even remotely suggest the existence of an enterprise are that "each defendant shared in profiting from the fraudulently-obtained funds in amounts presently unknown to plaintiff" and "all defendants conspired to obtain plaintiff's funds," (*id.* ¶ 23), but these assertions are also mere legal conclusions without factual support to demonstrate the existence of an "ongoing organization."  Plaintiff has failed to provide any information from which the Court can fairly conclude that the members functioned as a unit, including facts

regarding the hierarchy, organization, and activities of the alleged association-in-fact enterprise.[7]

Thus, I do not find plausible that the alleged constituent entities formed an enterprise.  *See*

*Satinwood*, 385 F.3d at 173, 175; *see also Nasik Breeding & Research Farm Ltd. v. Merck &*

*Co.*, 165 F. Supp. 2d 514, 539 (S.D.N.Y. 2001) (dismissing RICO claim where plaintiff merely

listed members of alleged enterprise and alleged that they were "combined in an association-in-

fact"; plaintiff "failed to present specific details of any hierarchy, organization, or unity among

the various alleged conspirators," and "conclusory naming of a string of entities [did] not

adequately allege an enterprise") (internal quotation marks omitted); *First Nationwide Bank v.*

*Gelt Funding, Corp.*, 820 F. Supp. 89, 97–98 (S.D.N.Y. 1993) (dismissing RICO claim where

plaintiff alleged that "at various times as early as 1985, and possibly earlier . . . defendants were

associated in fact for the common purpose, among others, of defrauding [plaintiff] through the

loan transactions described in this complaint and other means" and that "[t]his association in fact

was an 'enterprise,'" and stating that "[c]onclusory allegations that disparate parties were

associated in fact . . . are insufficient to sustain a RICO claim, absent allegations as to how the

members were associated together in an 'enterprise'") (internal quotation marks omitted), *aff'd*,

27 F.3d 763 (2d Cir. 1994).

   Further, Plaintiff fails to allege an enterprise that is separate and distinct from the

fraudulent SLC scheme in which Defendants allegedly engaged, and "[t]he non-existence of a

separate enterprise is fatal to Plaintiff['s] RICO claim."  *Kottler v. Deutsche Bank AG*, 607 F.

Supp. 2d 447, 458–59 (S.D.N.Y. 2009) (dismissing RICO claim in fraudulent tax shelter case

because plaintiff failed to show how defendants came together for a purpose other than creating

---

[7] That the Wallace Defendants may have been Porter and the POF Defendants' agent for jurisdictional purposes does not itself mean that they together formed a continuing unit or enterprise.

the fraudulent tax shelters, and thus they "did not exist as an association in fact separate and apart from the alleged RICO activity").

        **ii.**     **Pattern of Racketeering Activity**

A "pattern of racketeering activity" requires a plaintiff to plead at least two predicate acts of racketeering within ten years. *See* 18 U.S.C. § 1961(5). A "pattern" is established for RICO purposes where the predicate acts "themselves amount to, or . . . otherwise constitute a threat of, *continuing* racketeering activity." *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 240 (1989) (emphasis in original). The Supreme Court has explained that predicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy the pattern requirement. *See id.* at 241–42. Rather, "a plaintiff in a RICO action must allege either an open-ended pattern of racketeering activity (*i.e.*, past criminal conduct coupled with a threat of future criminal conduct) or a closed-ended pattern of racketeering activity (*i.e.*, past criminal conduct extending over a substantial period of time)." *Satinwood*, 385 F.3d at 181 (internal quotation marks omitted); *see id.* (courts have held that two years is minimum duration for closed-ended continuity, but "mere fact that predicate acts span two years is insufficient, without more, to support a finding of a closed-ended pattern"); *see also Evercrete Corp. v. H-Cap Ltd.*, 429 F. Supp. 2d 612, 624–25 (S.D.N.Y. 2006) ("Courts have uniformly and consistently held that schemes involving a single, narrow purpose and one or few participants directed towards a single victim do not satisfy the RICO requirement of a closed or open pattern of continuity.") (internal quotation marks omitted).

The predicate acts that Plaintiff alleges are acts of wire fraud under 18 U.S.C. § 1343, (*see* SAC ¶¶ 46, 51), which is an enumerated "racketeering activity" under 18 U.S.C. § 1961(1). The wire fraud statute requires a plaintiff to show the existence of a scheme to defraud,

defendants' knowing or intentional participation in the scheme, and the use of an interstate wire in furtherance of the scheme.  *S.Q.K.F.C., Inc. v. Bell Atl. TriCon Leasing Corp.*, 84 F.3d 629, 633 (2d Cir. 1996).  Further, for a civil RICO claim such as this one, where the alleged predicate acts are frauds, a plaintiff must plead these acts with particularity under Federal Rule of Civil Procedure 9(b).  *Moore v. PaineWebber, Inc.*, 189 F.3d 165, 173 (2d Cir. 1999); *see Plount v. Am. Home Assurance Co.*, 668 F. Supp. 204, 206 (S.D.N.Y. 1987) ("[A]ll of the concerns that dictate that fraud be pleaded with particularity exist with even greater urgency in civil RICO actions.")  "[T]he complaint [must] specify the statements it claims were false or misleading, give particulars as to the respect in which plaintiff[] contend[s] the statements were fraudulent, state when and where the statements were made, and identify those responsible for the statements," as well as "allege facts that give rise to a strong inference of fraudulent intent." *Moore*, 189 F.3d at 173 (internal quotation marks omitted); *see Cont'l Kraft Corp. v. Euro-Asia Dev. Grp., Inc.*, No. 97-CV-0619, 1997 WL 642350, at *5 (E.D.N.Y. Sept. 8, 1997) ("A claim of . . . wire fraud must specify the content, date, and place of any alleged misrepresentations and the identity of the persons making them. . . . [t]he cases are legion that a RICO complaint cannot be predicated on innocuous business communications, absent some factual basis for inferring the sender's intent to defraud the recipient via a scheme to defraud.") (third alteration in original) (internal quotation marks omitted).

Although the SAC sets forth specific statements that Plaintiff contends were fraudulent, and provides facts that give rise to an inference of fraudulent intent, the SAC is deficient for its failure to plead either an open- or closed-ended "pattern of racketeering activity."  *See Ray Larsen Assocs., Inc. v. Nikko Am., Inc.*, No. 89-CV-2809, 1996 WL 442799, at *7–8 (S.D.N.Y. Aug. 6, 1996) (finding no open- or closed-ended pattern where there was no threat of criminal

16

activity into future and alleged scheme lasted only seventeen months).  Plaintiff does not allege

any threats of future criminal conduct by the Defendants for an open-ended pattern, *cf. DeFalco*

*v. Bernas*, 244 F.3d 286, 324 (2d Cir. 2001) (escalating nature of demands by defendants

demonstrated that they had "no intention of stopping once they met some immediate goal . . .

[and] would have continued extorting the plaintiffs into the future"), or conduct that lasted at

least two years to form a closed-ended pattern, *see Spool v. World Child Int'l Adoption Agency*,

520 F.3d 178, 184 (2d Cir. 2008) (sixteen-month period insufficient for closed-ended continuity,

especially where plaintiff did not allege separate schemes or large number of participants or

victims).

     Because Plaintiff fails to adequately plead the enterprise and pattern-of-racketeering-

activity prongs of a civil RICO claim, the motions to dismiss this claim are granted.[8]

     **C.**     <u>**Fraud**</u>

          **i.**     <u>**Claim**</u>

     Porter and the POF Defendants argue that Plaintiff's fraud claim fails because (1) the

fraud is not pleaded with particularity and (2) Plaintiff attempts to recast a breach of contract

claim as a fraud claim.  (*See* Porter's Mem. 10–11; POF Ds' Mem. 20–22.)  The POF

Defendants also claim that they cannot be held liable for allegedly inducing Plaintiff to enter into

the SLC Agreement because the representations that Plaintiff attributes to these Defendants were

---

[8]  Although the SAC does not expressly allege a RICO conspiracy claim under 18 U.S.C. § 1962(d), (*but see* P's Mem. 17 (arguing that it adequately states a claim for RICO conspiracy)), Defendants further argue in their instant motions that such claim should be dismissed, (*see* POF Ds' Mem. 19–20; POF Ds' Reply Mem. 10; Wallace Ds' Mem. 11–12; Wallace Ds' Reply Mem. 5–6).  Even if Plaintiff had pleaded a RICO conspiracy claim, it would be dismissed.  Section 1962(d) provides that "[i]t shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."  18 U.S.C. § 1962(d).  Thus, "a plaintiff must prove the existence of an agreement to violate RICO's substantive provisions" to establish a RICO conspiracy.  *Cofacrèdit, S.A. v. Windsor Plumbing Supply Co.*, 187 F.3d 229, 244 (2d Cir. 1999) (internal quotation marks omitted).  For the same reasons that Plaintiff "did not adequately allege a substantive violation of RICO," its conspiracy claim is "properly dismissed."  *Satinwood*, 385 F.3d at 182.

made months after Plaintiff entered into the SLC Agreement and wired funds under it and, further, they were not parties to the SLC Agreement. (*See* POF Ds' Mem. 22; POF Ds' Reply Mem. 9.) The Wallace Defendants state that Plaintiff fails to plead fraud against them with particularity under Rule 9(b) because Plaintiff does not set forth any representations or statements that the Wallace Defendants made in connection with the alleged fraud. (*See* Wallace Ds' Mem. 14–17; Wallace Ds' Reply Mem 8–9.)

To plead fraud under New York law,[9] a plaintiff must plead "(1) a representation of material fact, (2) which was untrue, (3) which was known to be untrue or made with reckless disregard for the truth, (4) which was offered to deceive another or induce him to act, and (5) which that other party relied on to its injury." *Aetna Cas. & Sur. Co. v. Aniero Concrete Co.*, 404 F.3d 566, 580 (2d Cir. 2005); *accord Eurycleia Partners*, 12 N.Y.3d at 559. Further, as discussed above, claims of fraud are subject to the heightened pleading requirement of Rule 9(b), *see Aetna Cas.*, 404 F.3d at 582, which requires a party to state with particularity the

---

[9] None of parties address which state's law applies to Plaintiff's tort claims. The SLC Agreement states that that agreement "shall be construed and governed by the Laws of Dade County, Florida." (SLC Agreement ¶ 5.13). The Escrow Agreement provides that it "will be governed by and construed pursuant to the laws of New York." (Escrow Agreement ¶ 11.1.) The POF Defendants note, in connection with their personal jurisdiction argument, that Plaintiff and the POF Defendants entered into a Finder's Fee Agreement in which these parties "expressly consented to jurisdiction, choice of law and performance of obligations in the State of Tennessee, not New York." (*See* POF Ds' Reply Mem. 2–3.) Because Plaintiff is not alleging any claims in connection with the alleged Finder's Fee Agreement, Tennessee law is inapplicable to Plaintiff's state law claims. I must thus decide whether to apply Florida or New York law to Plaintiff's fraud, conversion, and unjust enrichment claims.

"A federal district court applies the choice-of-law rules of the State in which it sits." *Grund v. Del. Charter Guarantee & Trust Co.*, 788 F. Supp. 2d 226, 243 (S.D.N.Y. 2011) (citing *Klaxon v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 494 (1941)). "'The first step in any case presenting a potential choice of law issue is to determine whether there is an actual conflict between the laws of the jurisdictions involved.'" *Md. Cas. Co. v. Cont'l Cas. Co.*, 332 F.3d 145, 151 (2d Cir. 2003) (quoting *In re Allstate Ins. Co.*, 81 N.Y.2d 219, 223 (1993)). If no conflict exists, a court applies the laws of the forum state in which the action is heard. *Wall v. CSX Transp., Inc.*, 471 F.3d 410, 422–23 (2d Cir. 2006); *accord Excess Ins. Co. v. Factory Mut. Ins. Co.*, 769 N.Y.S.2d 487, 489 (1st Dep't 2003). Because I find that no conflict exists between New York and Florida law regarding Plaintiff's claims of fraud, *compare Eurycleia Partners, LP v. Seward & Kissel, LLP*, 12 N.Y.3d 553, 559 (2009), *with Susan Fixel, Inc. v. Rosenthal & Rosenthal, Inc.*, 842 So. 2d 204, 209 (Fla. Dist. Ct. App. 2003), conversion, *compare Colavito v. N.Y. Organ Donor Network*, 8 N.Y.3d 43, 49–50 (2006), *with Edwards v. Landsman*, 51 So. 3d 1208, 1213 (Fla. Dist. Ct. App. 2011), or unjust enrichment, *compare Mandarin Trading Ltd. v. Wildenstein*, 16 N.Y.3d 173, 182 (2011), *with Golden v. Woodward*, 15 So. 3d 664, 670 (Fla. Dist. Ct. App. 2009), I will analyze Plaintiff's state law claims under New York law.

circumstances constituting the fraud, including (1) specifying statements that the plaintiff

contends were fraudulent, (2) identifying the speaker, (3) stating where and when the statements

were made, and (4) explaining why the statements were fraudulent, *Shields v. Citytrust Bancorp,*

*Inc.*, 25 F.3d 1124, 1127–28 (2d Cir. 1994).  Although intent may be averred generally under

Rule 9(b), *see* Fed. R. Civ. P. 9(b), the plaintiff must allege "specific facts from which a

reasonable trier of fact could directly or indirectly infer that the promisor intended not to honor

his obligations at the time the promise was made," *Drexel Burnham Lambert Inc. v. Saxony*

*Heights Realty Assocs.*, 777 F. Supp. 228, 235 (S.D.N.Y. 1991).  "The requisite 'strong

inference' of fraud may be established either (a) by alleging facts to show that defendants had

both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong

circumstantial evidence of conscious misbehavior or recklessness."  *Lerner v. Fleet Bank, N.A.*,

459 F.3d 273, 290–91 (2d Cir. 2006) (internal quotation marks omitted).

Plaintiff plausibly alleges that each of Porter, Brigadier, and Mayes represented that he

worked for POF and could obtain a $16 million standard letter of credit from USB for Plaintiff.

(SAC ¶ 11.)  After Plaintiff read a brochure allegedly prepared by Brigadier, Mayes, and Porter,

claiming that POF could obtain "cash backed callable, lienable, transferable and assignable

instruments from AS rated institutions which can be used as default collateral," (*id.* ¶ 15), Porter

delivered the SLC Agreement by e-mail on or about December 14, 2007, which Porter signed as

"Director of Finance," purportedly on behalf of POF, (*id.* ¶ 11; *see* SAC Ex. A).  In reliance on

the above representations, Plaintiff signed the SLC Agreement and wired $680,000 to the

Wallace Defendants' IOLA account in exchange for the fake SLC.  (*See* SAC ¶¶ 21, 24.)

Plaintiff also plausibly alleges that the POF Defendants continued to perpetrate the fraud in

follow-up communications in which they stated, for example, "[t]he block has been requested for

your $16m instrument . . . . We will send you . . . the correspondence (I.e. [*sic*] Euroclear Screen Shot Confirming Block) once this task has been completed," and "[a]s soon as Ricardo finishes the Bank to Bank procedures you are ready to go."  (*Id.* ¶ 19; Wise Decl. Exs. D, E.)  Further, over a year after entering into the SLC Agreement, Brigadier wrote a letter to Plaintiff on POF letterhead to advise it that the SLC was due to expire and that "when you [Plaintiff] are prepared to use the Letter of Credit in an authorized transaction, we [POF] will then authorize the re-issuance of the letter of credit at a reduced price of one hundred thousand €100,000.00 Euros." (SAC ¶ 19; Wise Decl. Ex. F.)  These facts are sufficient for Plaintiff to aver the circumstances of the fraud with particularity under Rule 9(b).

Plaintiff also pleads facts giving rise to a strong inference of fraud.  Plaintiff alleges that Porter and the POF Defendants' motive was to "profit[] from the fraudulently-obtained funds," (SAC ¶ 23), and states that they had the opportunity to carry out the alleged fraud by making "representations . . . with knowledge of their falsity or with reckless disregard for their truth, and . . . with the intention that the plaintiff rely on them," (*id.* ¶ 21).  Further, the alleged repeated false representations, including those that the POF Defendants made months after the SLC Agreement had been signed, plausibly lulled Plaintiff into not discovering the fraud and constitute circumstantial evidence of conscious misbehavior and recklessness.  Thus the facts in the SAC plausibly demonstrate that Porter and the POF Defendants made false representations to Plaintiff that induced it to act to its detriment.  Because Plaintiff adequately pleads the four elements of a fraudulent inducement claim, as well as the requisite mental state, with

particularity, the allegations against Porter and the POF Defendants in the SAC are sufficient to withstand dismissal.[10]

Plaintiff does not, however, make any specific allegations against the Wallace Defendants to plausibly demonstrate that they made any misrepresentations of fact or were aware of or knowingly involved in the alleged fraud.  Rather, the only allegations regarding the Wallace Defendants show that that they "agreed to act" as the Escrow Agent, (SAC ¶ 25), and that they paid out the funds to the other Defendants under the Escrow Agreement, (*see id.* ¶ 32).  For all one can tell from the SAC, the Wallace Defendants appear to have unknowingly received the fraudulent SLC, which looked genuine, and according to their duties under the Escrow Agreement, which "[we]re purely ministerial in nature," (SAC Ex. A, Annex E ¶ 4.1.3), disbursed the funds in accordance with the terms of the payment instructions annexed to the SLC Agreement, (*see* SAC Ex. A, Annex E; SAC Ex. A, Annex B).  Nothing in the Escrow Agreement required the Wallace Defendants to call UBS to confirm the SLC's validity or to investigate the authenticity of a document that appeared in all respects to be genuine.  Taking the

---

[10]  Contrary to Porter's assertion, Plaintiff does not merely recast a breach of contract claim in the language of fraud. (*See* Porter's Mem. 10.)  Indeed, Plaintiff does not seek to bring breach of contract and fraud claims premised on the same set of facts, and, in any event, had Plaintiff brought a breach of contract claim, its fraud claim would survive the instant motions.  Although "[i]t is black letter law in New York that a claim for common law fraud will not lie if the claim is duplicative of a claim for breach of contract," *Clifton v. Vista Computer Servs., LLC*, No. 01-CV-10206, 2002 WL 1585550, at *2 (S.D.N.Y. July 16, 2002); *see Richbell Info. Servs., Inc. v. Jupiter Partners, L.P.*, 765 N.Y.S.2d 575, 589 (1st Dep't 2003), "a claim based on fraudulent inducement of a contract is separate and distinct from a breach of contract claim under New York law," *Merrill Lynch & Co. v. Allegheny Energy, Inc.*, 500 F.3d 171, 184 (2d Cir. 2007) (misrepresentation of present fact gives rise to fraud claim separate from breach of contract claim); *see also Stewart v. Jackson & Nash*, 976 F.2d 86, 89 (2d Cir. 1992) (defendant's declaration that it had secured large environmental law client and was in process of establishing environmental law department were misrepresentations of fact giving rise to separable fraud claim); *Hargrave v. Oki Nursery, Inc.*, 636 F.2d 897, 899 (2d Cir. 1980) (allegations that defendant knowingly misrepresented the health of wine grape vines, the subject of plaintiff's purchase, stated a claim for fraud); *DIRECTV Latin Am., LLC v. Park 610, LLC*, 691 F. Supp. 2d 405, 437 (S.D.N.Y. 2010) (misrepresentations regarding defendant's business structure and shares in a defendant's member corporation gave rise to fraud claim).  Here, Plaintiff plausibly alleges that Porter and the POF Defendants misrepresented the present fact that POF—the company these Defendants allegedly represented—had a business relationship with UBS "that would allow them to obtain a standby letter of credit" for $16 million.  (SAC ¶ 21.) Thus, Plaintiff has plausibly alleged that it was fraudulently induced to enter into the SLC Agreement.  *See RKB Enters. Inc. v. Ernst & Young*, 582 N.Y.S.2d 814, 816 (3d Dep't 1992) ("A party fraudulently induced to enter into a contract may join a cause of action for fraud with one for breach of the same contract.").

facts in the light most favorable to Plaintiff, Plaintiff has not pleaded facts suggesting that the Wallace Defendants knew of the fraud; indeed, the facts as alleged are completely consistent with the Wallace Defendants having been fooled as Plaintiff was. *See Iqbal*, 129 S. Ct. at 1949 ("Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief.") (internal quotation marks omitted). Because Plaintiff fails to set forth any facts that plausibly show that the Wallace Defendants made any misrepresentations of fact or were in on the alleged fraud, it has not nudged its claim against them across the line from conceivable to plausible, *see Twombly*, 550 U.S. at 570, and thus the fraud claim is dismissed as to these Defendants.

## ii.    <u>Request for Punitive Damages</u>

The POF Defendants and Wallace Defendants also argue that Plaintiff's claim for punitive damages in connection with the fraud cause of action should be dismissed because punitive damages are only awarded in "singularly rare cases," and this is not such a case. (*See* Wallace Ds' Mem. 16; POF Ds' Mem. 24–25.) Having dismissed the fraud claim as to the Wallace Defendants, I address this motion only with respect to the POF Defendants.

For punitive damages to be awarded in a tort action, "[t]here must be circumstances of aggravation or outrage, such as spite or 'malice,' or a fraudulent or evil motive on the part of the defendant, or such a conscious and deliberate disregard of the interests of others that the conduct may be called wilful or wanton." *Fortnow v. Hughes Hubbard & Reed, LLP*, No. 125924/02, 2005 WL 3506955, at *4 (N.Y. Sup. Ct. 2005) (internal quotation marks omitted); *accord Goldberg v. UBS AG*, 660 F. Supp. 2d 410, 428 (E.D.N.Y. 2009). The conduct alleged must be "intentional, malicious, outrageous, or otherwise aggravated beyond mere negligence . . . [and] must be supported by clear, unequivocal and convincing evidence." *Fortnow*, 2005 WL

3506955, at *4 (internal quotation marks omitted).  Further, "a private party seeking to recover punitive damages must not only demonstrate egregious tortious conduct by which he was aggrieved and which is actionable as an independent tort, but also that such conduct was part of a pattern of similar conduct directed at the public generally."  *Id.*; *accord N.Y. Univ. v. Cont'l Ins. Co.*, 87 N.Y.2d 308, 316 (1995).

Although Plaintiff has not addressed this aspect of Defendants' motions, and I could thus regard the claim as abandoned, *see Adams v. N.Y. State Educ. Dep't*, 752 F. Supp. 2d 420, 452 n.32 (S.D.N.Y. 2010) (collecting cases), I decline to do so.  For the reasons set forth above regarding the fraud claim, I cannot say at this stage that it is implausible that the Porter and the POF Defendants acted with fraudulent or evil motive in setting up the SLC transaction or sending the fake SLC to Plaintiff.  Further, Plaintiff alleges that the POF Defendants advertised their services, apparently widely, through brochures and a website, (*see* SAC ¶¶ 15, 16, 27), and that there are potentially other victims of similar conduct by these Defendants, (*see id.* ¶¶ 26, 28).  Should the facts as developed in discovery show that Plaintiff cannot prove this claim by clear, unequivocal, and convincing evidence, the matter may be revisited on summary judgment.  For now, the POF Defendants' motion regarding Plaintiff's punitive damages claim is denied.

### D.    Conversion

Next, Porter and the POF Defendants argue that Plaintiff's conversion claim fails because Plaintiff does not to allege which Defendants were responsible for the alleged conversion or that Defendants exercised dominion over Plaintiff's funds to the exclusion of Plaintiff's rights.  (*See* Porter's Mem. 12–13; POF Ds' Mem. 23–24.)

To state a claim for conversion under New York law, a plaintiff must allege "(1) legal ownership or an immediate superior right of possession to a specific identifiable thing and (2)

that the defendant exercised an unauthorized dominion over the thing in question, to the alteration of its condition or to the exclusion of the plaintiff's rights." *Ancile Inv. Co. v. Archer Daniels Midland Co.*, 784 F. Supp. 2d 296, 312 (S.D.N.Y. 2011) (internal quotation marks omitted); *accord Colavito*, 8 N.Y.3d at 49–50 ("A conversion takes place when someone, intentionally and without authority, assumes or exercises control over personal property belonging to someone else, interfering with that person's right of possession.").  Further, a conversion can occur even in situations "where possession of property is initially lawful, . . . when there is a refusal to return the property upon demand." *Salatino v. Salatino*, 881 N.Y.S.2d 721, 723 (3d Dep't 2009).  Where money is the subject property of a conversion claim, the "money 'must be specifically identifiable and be subject to an obligation to be returned or to be otherwise treated in a particular manner.'" *Robert Smalls Inc. v. Hamilton*, No. 09-CV-7171, 2010 WL 3238955, at *8 (S.D.N.Y. July 19, 2010) (quoting *Key Bank of N.Y. v. Grossi*, 642 N.Y.S.2d 403, 405 (3d Dep't 1996)).

Plaintiff plausibly alleges that it wired $680,000 to the Wallace Defendants, which was subsequently disbursed to the Defendants in accordance with the payment instructions annexed to the SLC Agreement, (SAC ¶¶ 22, 29; *see* SAC Ex. A, Annex B), and that, although Plaintiff made a demand for the return of its funds, Defendants refused to return the money, (SAC ¶ 34). Even if the Wallace Defendants initially possessed the money lawfully pursuant to the Escrow Agreement, the later possession by Porter and the POF Defendants was plausibly unlawful given that they allegedly obtained release of the money by sending the fraudulent SLC, accepted payment under the SLC Agreement, and then refused to deliver the funds back to Plaintiff upon demand.  Accordingly, the allegations in the SAC plausibly plead a claim for conversion under

New York law against Porter and the POF Defendants, and their motions to dismiss this claim are denied.

### E.    <u>Unjust Enrichment</u>

Plaintiff brings its third cause of action against all the Defendants for unjust enrichment, and seeks for the Court to "impose a constructive trust on the funds of plaintiff so obtained [by fraud] by defendants." (*See* SAC ¶¶ 41–44.)  Porter argues that Plaintiff's unjust enrichment claim fails for the same reason as its conversion claim—namely, that Plaintiff does not allege which Defendants were unjustly enriched—and because the claim is really one for breach of contract.  (*See* Porter's Mem. 13–14.)  The POF Defendants argue that Plaintiff has failed to establish why a constructive trust should be imposed because Plaintiff does not allege what promise the POF Defendants made to Plaintiff, how they were unjustly enriched, or the requisite confidential or fiduciary relationship.  (*See* POF Ds' Mem. 22–23.)

### i.    <u>Claim</u>

A cognizable unjust enrichment claim requires a showing "1) that the defendant benefitted; 2) at the plaintiff's expense; and 3) that 'equity and good conscience' require restitution."  *Kaye v. Grossman*, 202 F.3d 611, 616 (2d Cir. 2000); *accord Mandarin Trading*, 16 N.Y.3d at 182.  "The 'essence' of such a claim 'is that one party has received money or a benefit at the expense of another.'"  *Kaye*, 202 F.3d at 616 (quoting *City of Syracuse v. R.A.C. Holding, Inc.*, 685 N.Y.S.2d 381, 382 (4th Dep't 1999)).  "Enrichment alone will not suffice to invoke the remedial powers of a court of equity.  Critical is that under the circumstances and as between the two parties to the transaction the enrichment be unjust."  *1133 Taconic, LLC v. Lartrym Servs., Inc.*, 925 N.Y.S.2d 840 (2d Dep't 2011) (internal quotation marks omitted).

25

Here, Plaintiff has plausibly alleged that Porter and the POF Defendants made false representations to Plaintiff regarding the SLC to fraudulently obtain $440,000 and $240,000, respectively, and thus they were unjustly enriched when they sent the fake SLC in return. Accordingly, Porter and the POF Defendants' motions to dismiss Plaintiff's unjust enrichment claim are denied.

**ii.**      **Constructive Trust**

A constructive trust is a "fraud-rectifying remedy," *Bankers Sec. Life Ins. Soc. v. Shakerdge*, 49 N.Y.2d 939, 940 (1980) (internal quotation marks omitted), the purpose of which is to prevent unjust enrichment, *Simonds v. Simonds*, 45 N.Y.2d 233, 242 (1978).  "Under New York law, the equitable remedy of a constructive trust is appropriate when there is clear and convincing evidence of (1) a confidential or fiduciary relationship; (2) an express or implied promise; (3) a transfer in reliance on such a promise; and (4) unjust enrichment."  *Martha Graham Sch. & Dance Found., Inc. v. Martha Graham Ctr. of Contemporary Dance, Inc.*, 380 F.3d 624, 646 (2d Cir. 2004); *accord Depena v. Shocker*, 922 N.Y.S.2d 119, 120–21 (2d Dep't 2011).  Although the Second Circuit has held that a constructive trust is "a flexible device" that cannot be "bound by an unyielding formula," *Golden Budha Corp. v. Canadian Land Co. of Am., N.V.*, 931 F.2d 196, 202 (2d Cir. 1991) (internal quotation marks omitted), and that the lack of a confidential or fiduciary relationship does not "automatically defeat[] [a] claim of constructive trust . . . when [use of such device is] otherwise required by equity," *Koreag, Controle et Revision S.A. v. Refco F/X Assocs., Inc. (In re Koreag, Controle et Revision S.A.)*, 961 F.2d 341, 353 (2d Cir. 1992), courts have found that the failure to plead a confidential or fiduciary relationship can be fatal to a claim for a constructive trust, *see, e.g.*, *Atateks Foreign Trade Ltd. v. Dente*, 798 F. Supp. 2d 506, 507 (S.D.N.Y. 2011) (dismissing claim for constructive trust

26

where plaintiff failed to allege a confidential or fiduciary relationship with defendant); *Pons v. People's Republic of China*, 666 F. Supp. 2d 406, 415 (S.D.N.Y. 2009) (same); *DLJ Mortg. Capital, Inc. v. Kontogiannis*, No. 08-CV-4607, 2009 WL 1652253, at *4 (E.D.N.Y. June 4, 2009) (same); *Faulkner v. Arista Records LLC*, 602 F. Supp. 2d 470, 484 (S.D.N.Y. 2009) (dismissing claim for constructive trust where plaintiff alleged fiduciary relationship, but court concluded that no such relationship existed).

Plaintiff does not plead—and the facts as alleged in the SAC do not suggest—that the SLC transaction was anything more than a garden-variety arm's-length transaction. *See Diversified Carting, Inc. v. City of N.Y.*, No. 04-CV-9507, 2006 WL 147584, at *10 (S.D.N.Y. Jan. 20, 2006) ("Purely commercial transactions do not give rise to a fiduciary relationship.") (internal quotation marks omitted). Plaintiff's failure to set forth facts from which the Court can infer that any of the Defendants stood in a confidential or fiduciary capacity with respect to Plaintiff "is fatal to its claim for a constructive trust," *Atateks*, 798 F. Supp. 2d at 507; *compare In re Koreag*, 961 F.2d at 353–54 (finding absence of fiduciary relationship did not defeat claim for constructive trust where equity "otherwise required" such finding based on defendant's status as liquidator for insolvent estate, which rendered it in "fiduciary status vis-a-vis creditors of the insolvency estate"), *with Atateks*, 798 F. Supp. 2d at 507 (determining that "there [we]re no similar considerations [as those found in *In re Koreag*] that warrant[ed] dispensing with the requirement of a confidential or fiduciary relationship between the parties"). The claim for a constructive trust is therefore dismissed.

## IV.   <u>LEAVE TO AMEND</u>

Leave to amend a complaint should be freely given when justice so requires. Fed. R. Civ. P. 15(a)(2). It is within the sound discretion of the district court to grant or deny leave to amend.

*McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007).  "Leave to amend, though liberally granted, may properly be denied for:  'undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.'"  *Ruotolo v. City of N.Y.*, 514 F.3d 184, 191 (2d Cir. 2008) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)).  Amendment is futile when the claim as amended cannot "withstand a motion to dismiss pursuant to Rule 12(b)(6)," and "[i]n deciding whether an amendment is futile, the court uses the same standard as those governing the adequacy of a filed pleading."  *MacEntee v. IBM*, 783 F. Supp. 2d 434, 446 (S.D.N.Y. 2011) (internal quotation marks omitted).  Where the problem with a claim "is substantive . . . better pleading will not cure it," and "[r]epleading would thus be futile."  *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000).

At a pre-motion conference held on March 28, 2011, Defendants apprised Plaintiff of the grounds upon which they intended to (and ultimately did) base their motions to dismiss, and I gave Plaintiff a second chance to amend its pleadings after I flagged additional defects that Plaintiff needed to cure.  I further stated that I would not give Plaintiff leave to amend again on any defects to which the Defendants or I alerted it at the conference.  Plaintiff's failure to fix some deficiencies in its previous pleadings alone is sufficient ground to deny leave to amend *sua sponte*.  *See In re Eaton Vance Mut. Funds Fee Litig.*, 380 F. Supp. 2d 222, 242 (S.D.N.Y. 2005) (denying leave to amend because "the plaintiffs have had two opportunities to cure the defects in their complaints, including a procedure through which the plaintiffs were provided notice of defects in the Consolidated Amended Complaint by the defendants and given a chance to amend their Consolidated Amended Complaint," and "plaintiffs have not submitted a proposed amended

28

complaint that would cure these pleading defects"), *aff'd sub nom. Bellikoff v. Eaton Vance Corp.*, 481 F.3d 110, 118 (2d Cir. 2007) ("plaintiffs were not entitled to an advisory opinion from the Court informing them of the deficiencies in the complaint and then an opportunity to cure those deficiencies") (internal quotation marks omitted); *see also Ruotolo*, 514 F.3d at 191 (affirming denial of leave to amend "given the previous opportunities to amend").  Further, Plaintiff has not requested leave to file a Third Amended Complaint or otherwise suggested that it is in possession of facts that could cure the pleading deficiencies in its RICO or constructive trust claims or the fraud claim against the Wallace Defendants.  Accordingly, I decline to grant Plaintiff leave to amend *sua sponte* with respect to the dismissed claims.  *See, e.g.*, *Gallop v. Cheney*, 642 F.3d 364, 369 (2d Cir. 2011) (no error in failing to grant leave to amend where it was not sought); *Walton v. Morgan Stanley & Co.*, 623 F.2d 796, 799 n.7 (2d Cir. 1980) ("[A]ppellants never sought leave to amend their complaint either in the district court or as an alternative form of relief in this court after [appellee] raised the issue of the sufficiency of appellants' complaint.  Accordingly, we see no reason to grant such leave sua sponte.").

## V.   **CONCLUSION**

For the foregoing reasons, the motions of Porter and the POF Defendants are GRANTED as to the RICO and constructive trust claims, and DENIED as to the fraud, conversion, unjust enrichment, and punitive damages claims.  The Wallace Defendants' motion is GRANTED as to the RICO and fraud claims.  The Clerk of Court is respectfully directed to terminate the pending motions.  (Docs. 33, 37, 43.)  The parties are to appear for a status conference on **April 23, 2012** at **4:30 p.m.**

**SO ORDERED.**

DATED:        White Plains, New York
              March 23, 2012

                                      _Cathy Seibel_
                                      Cathy Seibel, U.S.D.J.